IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>vs.<br><br>ALEX C. TAYLOR,<br><br>      Defendant. | 8:13CR223<br><br>FINDINGS AND RECOMMENDATION |

  This matter is before the court on the defendant's, Alex C. Taylor (Taylor), Motion to Suppress (Filing No. 32). Taylor is charged in the Indictment with a conspiracy to distribute and possess with intent to distribute methamphetamine (Count I), in violation of 21 U.S.C. § 846, and the possession with intent to distribute methamphetamine and heroin (Counts II and III), in violation of 21 U.S.C. § 841(a)(1) and (b)(1). **See** Filing No. 1 - Indictment. Taylor seeks to suppress statements Taylor gave to police and items seized as a result of an automobile search. **See** Filing No. 32 - Motion.

  The court held an evidentiary hearing on October 24, 2013. Taylor participated by telephone. Joseph L. Howard represented Taylor. The United States was represented by Assistant U.S. Attorney David M. Wear. The court received into evidence three photographs of ruse checkpoint road signs (Exs. 1-3), a Google map satellite view of the Maxwell, Nebraska, interchange on Interstate 80 (Ex. 4), Nebraska State Patrol (NSP) Sergeant Gordon Downing's (Sergeant Downing) patrol vehicle video (Ex. 5), a Jeep rental agreement (Ex. 6), a Uniform Citation and Complaint (Ex. 7), a Violation/Warning Form (Ex. 8), and Trooper Hayes' patrol vehicle video (Ex. 9). A transcript of the hearing (TR.) was prepared and filed on October 29, 2013. **See** Filing No. 45.

### FINDINGS OF FACT

  On Friday, April 19, 2013, Sergeant Downing, employed with the NSP for fifteen-and-a-half years, conducted a ruse checkpoint operation east of Lincoln County, Nebraska, at the Maxwell interchange on Interstate 80 (TR. 4-10). A ruse checkpoint involves placing signs along the interstate indicating drivers should be prepared to stop a mile ahead at a NSP checkpoint (TR. 10). There is no actual checkpoint (TR. 12).

The NSP places the signs near an interchange where there is minimum traffic or a rural area and troopers watch the interchange exit ramp for drivers who attempt to avoid a checkpoint by exiting the interstate prior to the checkpoint (TR. 10). Sergeant Downing would stop a vehicle if he witnessed a driver commit a traffic or law violation (TR. 10). On April 19, 2013, Sergeant Downing placed two signs before the eastbound exit on the Maxwell interchange and one sign immediately past the exit (TR. 12, 56). Sergeant Downing stationed his police vehicle southeast of the Maxwell interchange and used binoculars to monitor vehicles using the eastbound exit (TR. 13-14, 57-58). Sergeant Downing parked his patrol vehicle approximately 200 yards from the eastbound exit to avoid being seen by the drivers exiting the interstate (TR. 14, 58, 64). Sergeant Downing had an unobstructed view of the eastbound exit and the stop sign at the end of the exit (TR. 14-15, 58-59).

At 12:05 p.m., on April 19, 2013, Sergeant Downing observed a white Jeep use the eastbound exit on Interstate 80 at the Maxwell interchange, begin to turn right, and then turn left and drive north on the Maxwell link without using turn signals or coming to a complete stop at the stop sign (TR. 12-14, 60-61, 73). After witnessing two traffic violations, Sergeant Downing turned north on to the Maxwell link and followed the Jeep over the overpass (TR. 17-18). Sergeant Downing activated his patrol vehicle's video recorder as he drove onto the overpass (TR. 19). Although the video captures thirty seconds prior to activation, the video did not capture the traffic violations (TR. 19, 58). Sergeant Downing delayed in activating the camera because he had to engage his seat belt and back out of his parking spot (TR. 61-63). After Sergeant Downing drove over the overpass, Sergeant Downing followed the Jeep into a gas station and saw the Jeep drive past the west side of the east pumps and park on the east side of the east pumps (TR. 18). Sergeant Downing thought the behavior was unusual because the driver drove by both times with the driver's side facing the pumps (TR. 18). Sergeant Downing testified this indicated nervous behavior (TR. 28).

Sergeant Downing activated his lights and parked his patrol vehicle behind the Jeep as the front passenger exited the Jeep and walked toward the gas station store and the driver exited the Jeep and walked toward Sergeant Downing (TR. 20-21). Sergeant Downing told the driver to stop, informed the driver and passenger this was a traffic stop, and asked them to return to the Jeep (TR. 21). After the driver and

2

passenger returned to the Jeep and shut the doors, Sergeant Downing approached the Jeep and asked for their identification (TR. 21). Sergeant Downing identified the driver as Deontae Griffin (Griffin) and the passenger as Taylor (TR. 21). Sergeant Downing advised Griffin and Taylor of the reason for the traffic stop, asked to see a rental agreement (as he noticed the Jeep was a rental), and had Griffin accompany Sergeant Downing to the patrol vehicle (TR. 21-22).

Once in the Sergeant Downing's vehicle, Sergeant Downing reviewed Griffin's and Taylor's paperwork, requested background checks on Griffin and Taylor, and asked Griffin questions regarding Griffin's travel plans (TR. 24). Griffin said he was traveling to the University of Nebraska in Lincoln, Nebraska, for a football pro-day (TR. 24-26). Griffin told Sergeant Downing that Griffin did not own a car and a cousin rented the Jeep for Griffin (TR. 25-26). Sergeant Downing asked Griffin whether Griffin had a valid license and had a criminal record (TR. 27). Griffin responded he had a valid license and had never been arrested (TR. 27). Sergeant Downing asked why Griffin exited the interstate (TR. 27). Griffin stated he exited to refill his gas tank, which was half-full (TR. 27-28). Griffin said he drove around the pumps to get on the correct side for fuel (TR. 28). When Sergeant Downing pointed out Griffin kept the pumps on the same side of the Jeep both times, Griffin responded, "Well, then I don't know why I did it." (TR. 28). Griffin attempted on multiple occasions during the traffic stop to engage Sergeant Downing in a conversation regarding sports while they waited for the background checks to complete (TR. 29). Sergeant Downing noted Griffin seemed like he was trying to dominate the conversation (TR. 29-30). During their conversation, Griffin breathed heavily and his top lip and hands shook (TR. 30). Sergeant Downing considered Griffin's level of nervousness beyond the motoring public's average level of nervousness (TR. 30). Griffin's level of nervousness decreased by a small degree over the course of the traffic stop, although his nervousness was still noticeable (TR. 30).

Approximately ten minutes after Sergeant Downing initiated the traffic stop, Sergeant Downing received Griffin and Taylor's background information (TR. 31). Sergeant Downing learned Griffin had prior arrests and California had suspended Griffin's license (TR. 31). Sergeant Downing asked Griffin about the suspended license and Griffin provided a reason for the suspension; however, Sergeant Downing did not recall the reason at the hearing (TR. 31-32). Sergeant Downing noted Griffin's

suspended license and criminal history as relevant because first, Griffin should not have been driving, and second, Griffin lied to Sergeant Downing twice (TR. 32). After confronting Griffin with Griffin's record, Griffin and Sergeant Downing returned to discussing Griffin's pro-day trip and the fastest route to Lincoln, Nebraska (TR. 33). In addition to discussing football, Sergeant Downing and Griffin returned to discussing Griffin's travel plans (TR. 33-40). Griffin informed Sergeant Downing that Griffin and Taylor left California on April 18, 2013, and were not staying in Lincoln, but would return to California after the pro-day (TR. 33-34). Sergeant Downing considered this an unusually quick turnaround (TR. 34). Griffin stated he was not in school and not working (TR. 35-36). Griffin stated his mother paid for the rental and rented the Jeep about two days before Griffin and Taylor's trip (TR. 35-36). Sergeant Downing asked who Mario Crumble (Crumble) was as he was listed on the rental agreement (TR. 36). Griffin said Crumble was Griffin's uncle and then corrected himself and said he was Crumble's uncle (TR. 36). Sergeant Downing also asked whether Griffin was an authorized driver as the rental agreement noted "No other drivers permitted" (TR. 37).[1]

After approximately 25 minutes from initial contact with Griffin and Taylor, Sergeant Downing explained Griffin would receive a citation for not having a valid operator's license and a warning for failure to stop and signal (TR. 31, 38, 66). Sergeant Downing informed Griffin due to Griffin's suspended license, he would not be able to continue to drive the Jeep (TR. 39-40, 67-68, 70-71). Sergeant Downing provided Griffin with the citation and warning documents, Griffin's driver's license, and the rental agreement and asked Griffin to wait outside the passenger door of the Sergeant Downing's patrol vehicle while Sergeant Downing spoke with Taylor (TR. 40-41).

Sergeant Downing approached Taylor, who was sitting in the front passenger seat of the Jeep, and advised Taylor of Griffin's suspended license and asked Taylor whether he was comfortable driving (TR. 41). Sergeant Downing also asked Taylor about Taylor's travel plans (TR. 41-42). Taylor said he was going to visit a college and would stay in Nebraska until Sunday and did not mention attending a pro-day (TR. 42). Taylor stated Griffin's cousin or uncle rented the Jeep (TR. 42).

---

[1] The record does not indicate whether Griffin provided a response.

4

Sergeant Downing noted Taylor's responses were inconsistent with Griffin's (TR. 43, 68-69). Sergeant Downing asked Taylor if there was anything illegal in the vehicle (TR. 43-44). Taylor shook his head and said "no" (TR. 44). Sergeant Downing asked if he could search the Jeep (TR. 44). Taylor said "it was not his vehicle" (TR. 44). Sergeant Downing asked again if he could search the Jeep and Taylor said "yes" (TR. 44). Sergeant Downing had Taylor step out of the Jeep and went to speak with Griffin (TR. 44). Sergeant Downing asked Griffin if Griffin had drugs or anything illegal in the Jeep (TR. 44). Griffin responded "no" to both questions (TR. 44). Sergeant Downing asked if he could search the Jeep and Griffin responded "yeah, go ahead" (TR. 44-45). Sergeant Downing did not yell, threaten, brandish his weapon, or make promises to Griffin or Taylor when he asked for their consent (TR. 45-46). Griffin and Taylor did not appear intoxicated and did appear to understand Sergeant Downing's questions (TR. 46-47). When Sergeant Downing asked for consent, there were no other officers present (TR. 46-47).

Sergeant Downing subsequently searched the Jeep (TR. 45). Griffin and Taylor did not object to Sergeant Downing's search or limit their consent (TR. 48-49). Shortly after commencing the search, Trooper Hayes arrived on the scene (TR. 49). Sergeant Downing advised Trooper Hayes that Sergeant Downing was conducting a consent search of the Jeep but had only done a quick pat-down of Griffin and Taylor and not a search of their persons (TR. 49). Trooper Hayes proceeded to search Griffin and Taylor after obtaining their consent and placed them in his patrol vehicle (TR. 49-50). Trooper Hayes had his video recorder activated in his patrol vehicle and captured communication between Griffin and Taylor (TR. 50-51).[2] After securing Griffin and Taylor, Trooper Hayes assisted Sergeant Downing's search of the Jeep (TR. 51).

Sergeant Downing noticed an old and out of place portable stereo in the Jeep and remarked the screws on the bottom of the stereo had tool marks (TR. 51-52). Sergeant Downing opened the CD hatch to look inside the stereo and saw plastic-wrapped packages inside (TR. 52). Sergeant Downing opened the stereo and found four packages of suspected drugs (TR. 52). After discovering the packages, Sergeant Downing informed Taylor of the discovery and advised Taylor of his *Miranda* rights (TR.

---

[2] The court reviewed the recording and any conversation between Taylor and Griffin was inaudible. There was no other evidence presented as to the content of Taylor and Griffin's conversation.

5

52-54). Taylor requested to have an attorney present (TR. 54-55). Trooper Hayes subsequently took Griffin and Taylor to Lincoln County Jail while Sergeant Downing retrieved all items of evidentiary value and had the Jeep towed (TR. 55-56).

## LEGAL ANALYSIS

### A. Traffic Stop

Taylor argues Sergeant Downing did not conduct a valid traffic stop because, by the time Sergeant Downing pulled into the gas station, Griffin and Taylor had already stopped and exited the Jeep. **See** Filing No. 33 - Brief p. 4.

"A traffic violation, no matter how minor, provides an officer with probable cause to stop the driver. An officer is justified in stopping a motorist when the officer objectively has a reasonable basis for believing that the driver has breached a traffic law." ***United States v. Coleman***, 700 F.3d 329, 334 (8th Cir. 2012) (internal quotations and citations omitted). "An otherwise constitutional traffic stop is not invalidated by the fact that it was mere pretext for a narcotics search." ***United States v. Wright***, 512 F.3d 466, 471 (8th Cir. 2008) (internal quotation marks omitted). "An officer may initiate a traffic stop after the driver has stopped the car and exited the vehicle." ***United States v. Randolph***, 628 F.3d 1022, 1024 (8th Cir. 2011).

According to Neb. Rev. Stat. § 60-6,161:

> (1) No person shall turn a vehicle or move right or left upon a roadway unless and until such movement can be made with reasonable safety nor without giving an appropriate signal in the manner provided in sections 60-6,162 and 60-6,163.
> (2) A signal of intention to turn or move right or left when required shall be given continuously during not less than the last one hundred feet traveled by the vehicle before turning.

Neb. Rev. Stat. § 60-6,161(2). Additionally, failure to stop at a stop sign is a traffic violation under Nebraska law. **See** Neb. Rev. Stat. § 60-6,148(2).

In the instant matter, Sergeant Downing observed the Jeep exit Interstate 80 and approach the bottom of the exit ramp. Sergeant Downing observed the Jeep begin to turn right and then turn left without using a signal to turn in either direction. Sergeant Downing also observed the Jeep turn without coming to a complete stop at the stop sign. Sergeant Downing utilized binoculars to watch the Jeep and nothing obstructed

6

his view of the Jeep. The court finds Sergeant Downing had probable cause to stop the Jeep. Further, the court finds Sergeant Downing did in fact conduct a traffic stop even though Griffin and Taylor had already stopped and were exiting the Jeep at the gas station. **See *Randolph***, 628 F.3d at 1024.

B.   **Investigative Detention**

Taylor argues the traffic stop lasted longer than necessary and Sergeant Downing lacked reasonable suspicion to justify prolonged detention. **See** Filing No. 33 - Brief p. 5.

Contemporaneous with a valid traffic stop, the officer may "conduct an investigation that is reasonably related in scope to the circumstances that initially justified the stop." ***United States v. Bracamontes***, 614 F.3d 813, 816 (8th Cir. 2010). In fact, a police officer may detain the occupant while completing a number of routine tasks such as computerized checks of the vehicle registration, driver's license and criminal history, and issuing a citation. ***United States v. Quintero-Felix***, 714 F.3d 563, 567 (8th Cir. 2013); **see also *United States v. Sokolow***, 490 U.S. 1, 7 (1989). Additionally, an officer may inquire about the driver and other occupant's destination, purpose of the trip and whether the police officer may search the vehicle. ***Quintero-Felix***, 714 F.3d at 567; ***United States v. Mendoza***, 677 F.3d 822, 828 (8th Cir. 2012). "Asking an off-topic question, such as whether a driver is carrying illegal drugs, during an otherwise lawful traffic stop does not violate the Fourth Amendment." ***United States v. Riley***, 684 F.3d 758, 764 (8th Cir. 2012).

"If 'the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry to satisfy those suspicions.'" ***United States v. Ward***, 484 F.3d 1059, 1061 (8th Cir. 2007) (**quoting *United States v. Johnson***, 58 F.3d 356, 357 (8th Cir. 1995)). In any event, the scope and length of any investigation must be reasonable. ***United States v. Riley***, 684 F.3d 758, 765 (8th Cir. 2012). "The investigatory methods employed . . . should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." ***El-Ghazzawy v. Berthiaume***, 636 F.3d 452, 459 (8th Cir. 2011) (internal citations omitted). "A constitutionally permissible traffic stop can become unlawful, however, 'if it is prolonged beyond the time reasonably required to complete'

its purpose." ***United States v. Shafer***, 608 F.3d 1056, 1062 (8th Cir. 2010) (**quoting** ***Illinois v. Caballes***, 543 U.S. 405, 407 (2005)).  A motorist necessarily consents to an extension of the traffic stop when he consents to a search of the vehicle.  **See** ***Quintero-Felix***, 714 F.3d at 568; ***United States v. Rivera***, 570 F.3d 1009, 1013 (8th Cir. 2009).

Sergeant Downing's traffic stop of Griffin and Taylor was reasonable in duration. After approximately twenty-eight minutes, Sergeant Downing had Griffin's and Taylor's consent the search the Jeep.  By giving their consent to search, Griffin and Taylor thereby consented to an extension of the traffic stop.  During the twenty-eight minutes prior to consent, Sergeant Downing performed routine tasks attendant with a traffic stop, such as conducting computerized checks of Griffin and Taylor's licenses and criminal histories and writing a citation and warning.  Additionally, Sergeant Downing asked permissible questions regarding Griffin and Taylor's travel plans and the rental agreement for the Jeep.  Further, Sergeant Downing was within his authority to ask whether Griffin and Taylor had illegal items in the Jeep.  **See** ***Riley***, 684 F.3d at 764; ***United States v. Olivera-Mendez***, 484 F.3d 505, 511 (8th Cir. 2007) (finding no unreasonable seizure occurred during traffic stop based on probable cause when officer asked three questions about drug possession, which were unrelated to the traffic stop).

To the extent Taylor argues the traffic stop became unreasonably extended after Sergeant Downing gave Griffin the citation, warning, and personal documents, Taylor's argument is unpersuasive.  Although Sergeant Downing gave Griffin the necessary documents, the issue of who would drive the Jeep was unresolved, therefore Sergeant Downing needed to determine whether Taylor could drive, which required Sergeant Downing to actually speak with Taylor.  Sergeant Downing asked Taylor questions in addition to whether Taylor could drive, but as previously stated, questions regarding travel plans and illegal drugs are permissible, especially considering Griffin's unusual answers regarding travel plans and the Jeep, Griffin's nervousness, and Griffin's lies regarding his license and criminal history.  After considering the length of the traffic stop, the tasks performed during the stop, and the questions asked, the court finds no constitutional infirmity with Sergeant Downing's traffic stop.

### C.     Consent

Taylor argues consent to search the Jeep was not voluntarily given as a result of the stress created by the prolonged detention.  **See** Filing No. 33 - Brief p. 5.

To claim Fourth Amendment protection, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable.  **See *Minnesota v. Carter***, 525 U.S. 83, 88 (1998); ***United States v. Ruiz-Zarate***, 678 F.3d 683, 689 (8th Cir. 2012).  The reasonableness of the expectation of privacy must have "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society."  ***Rakas v. Illinois***, 439 U.S. 128, 143-44 n.12 (1978); **see also *Smith v. Maryland***, 442 U.S. 735, 740-41 (1979).  "If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched he has no standing to claim that they were searched or seized illegally."  ***United States v. Barragan***, 379 F.3d 524, 529-30 (8th Cir. 2004) (**quoting *United States v. Gomez***, 16 F.3d 254, 256 (8th Cir. 1994)).  A mere passenger in a vehicle has no legitimate expectation of privacy and therefore does not have standing to challenge a search of a vehicle.  **See *United States v. Crippen***, 627 F.3d 1056, 1063 (8th Cir. 2010).

Griffin stated his relative rented the Jeep and provided the Jeep for Griffin's use.  Griffin and Taylor both informed Sergeant Downing that Griffin was responsible for the Jeep.  Taylor even informed Sergeant Downing the Jeep was not Taylor's vehicle.  Therefore, Taylor does not have standing to contest Griffin's consent to search the Jeep.

Assuming *arguendo* Taylor has standing to contest the consent to search, the evidence demonstrates Griffin and Taylor both voluntarily consented to Sergeant Downing's search.  The Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  "While the Fourth Amendment does not permit warrantless searches, law enforcement may conduct such a search if they obtain [the owner's] voluntary consent."  ***United States v. Quintero***, 648 F.3d 660, 667 (8th Cir. 2011).  "Whether consent is voluntary is a question of fact . . . considering whether from the totality of the circumstances the officer reasonably believed the search was consensual."  ***United States v. Garcia***, 613 F.3d 749, 753 (8th Cir. 2010).  Some

9

personal characteristics that aid in determining voluntariness of consent are age, intelligence, whether an individual was under the influence of drugs or alcohol, whether an individual was read his *Miranda* rights, and whether an individual had experienced prior arrests. See *United States v. Capps*, 716 F.3d 494, 497 (8th Cir. 2013) (listing factors). A court may also look at environmental factors including, the period of time the individual was detained; whether the police threatened, physically intimidated, or punished the individual; whether promises or misrepresentations were made upon which the individual relied; whether the individual was in custody or under arrest at the time of consent; whether the consent occurred in a public or secluded place; and whether the individual objected or stood by silently while the search occurred. See *United States v. Hambrick*, 630 F.3d 742, 747-48 (8th Cir. 2011). This is a non-exhaustive list to assist the court's determination. *Quintero*, 648 F.3d at 667. "The government has the burden to prove the consent was voluntary by a preponderance of the evidence and based upon the totality of the circumstances." *United States v. Beasley*, 688 F.3d 523, 531 (8th Cir. 2012).

Sergeant Downing's stop of Griffin and Taylor was not unconstitutionally prolonged so as to create a coercive environment as Taylor suggests. See *Garcia*, 613 F.3d at 754 (holding a stop was not unreasonably prolonged when "[t]he whole encounter lasted less than 30 minutes"); *United States v. Suitt*, 569 F.3d 867, 871 (8th Cir. 2009) ("[T]here is no *per se* time limit on all traffic stops."). Additionally, reviewing the personal characteristics and environmental factors, Griffin and Taylor are adults, the gas station was not police dominated, Griffin and Taylor did not appear under the influence of alcohol or drugs, and Sergeant Downing did not employ threats, promises, misrepresentations, or brandish a weapon to obtain their consent. Based on the totality of the circumstances, the court finds Griffin and Taylor voluntarily consented to the search of the Jeep.

D.     **Statements**

In Taylor's conclusion, he argues all statements he made as a result of his encounter with Sergeant Downing should be suppressed. See Filing No. 33 - Brief p. 5.

Under the Fifth Amendment, the Self-Incrimination Clause provides, "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S.

Const. amend. IV. "[T]he core protection afforded by the Self-Incrimination Clause is a prohibition on compelling a criminal defendant to testify against himself at trial." *United States v. Patane*, 542 U.S. 630, 637 (2004). The touchstone for the admissibility of a defendant's statements is voluntariness. *Brown v. Mississippi*, 297 U.S. 278, 285-87 (1936). It is well settled a law enforcement official is required to advise an individual of his or her *Miranda* rights before questioning if that individual is in custody. See *United States v. Muhlenbruch*, 634 F.3d 987, 995 (8th Cir. 2011).

Taylor was *Mirandized* and asked for an attorney. The records indicates Taylor was not further interrogated. Any statements Taylor made to Griffin while sitting in Trooper Hayes' patrol vehicle were not the result of a custodial interrogation and do not require suppression. Lastly, the traffic stop and search did not violate Taylor's constitutional rights; therefore, there is no "fruit of the poisonous tree" issue with regard to any statements. Accordingly,

**IT IS RECOMMENDED TO SENIOR JUDGE RICHARD G. KOPF**:

The defendant's Motion to Suppress (Filing No. 32) be denied.

### ADMONITION

Pursuant to NECrimR 59.2 any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

Dated this 13th day of November, 2013.

BY THE COURT:

s/ Thomas D. Thalken
United States Magistrate Judge